**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| **LIBERTY UTILITIES (BELLA VISTA WATER) CORP.,** | MDL No. 2:18-mn-2873-RMG |
| **Plaintiff,** | This Document Relates To: |
| **v.** | **Case No.**   2:23-cv-02624-RMG |
| **3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.);** | **COMPLAINT** |
| **AGC CHEMICALS AMERICAS INC.;** | **JURY TRIAL DEMANDED** |
| **ANGUS FIRE ARMOUR CORPORATION;** | |
| **ARCHROMA U.S., INC.;** | |
| **ARKEMA INC.;** | |
| **BASF CORPORATION;** | |
| **BUCKEYE FIRE EQUIPMENT CO.;** | |
| **CARRIER GLOBAL CORPORATION;** | |
| **CHEMDESIGN PRODUCTS, INC.;** | |
| **CHEMGUARD, INC.;** | |
| **CHEMICALS INC.;** | |
| **CHUBB FIRE, LTD.;** | |
| **CIBA, INC. (F/K/A CIBA SPECIALTY CHEMICALS CORPORATION);** | |
| **CLARIANT CORP.;** | |
| **CORTEVA, INC.;** | |
| **DEEPWATER CHEMICALS, INC.;** | |
| **DUPONT DE NEMOURS, INC. (F/K/A DOWDUPONT, INC.);** | |
| **DYNAX CORP.;** | |
| **DYNEON LLC;** | |
| **E.I. DUPONT DE NEMOURS AND COMPANY;** | |
| **KIDDE FIRE FIGHTING, INC.;** | |
| **KIDDE PLC INC.;** | |
| **NATION FORD CHEMICAL COMPANY;** | |
| **RAYTHEON TECHNOLOGIES CORPORATION;** | |
| **THE ANSUL COMPANY;** | |
| **THE CHEMOURS COMPANY;** | |
| **THE CHEMOURS COMPANY FC, LLC;** | |
| **TYCO FIRE PRODUCTS LP;** | |

2

> **UTC FIRE & SECURITY AMERICAS CORPORATION, INC.;**
> **WILLIAMS FIRE & HAZARD CONTROL, INC;**
> **JOHN DOE DEFENDANTS 1-50,**
>
> **Defendants.**

Liberty Utilities (Bella Vista Water) Corp. ("Liberty" or "Plaintiff") files this Complaint against the Defendants named herein and in support thereof alleges as follows:

## SUMMARY OF THE CASE

1.      Plaintiff brings this action for damages, contribution and reimbursement of costs incurred, and which continue to be incurred, to address the presence of Per- and polyfluoroalkyl substances or "PFAS" chemicals—including but not limited to Perfluorooctanoic acid ("PFOA"), Perfluorooctanesulfonic acid ("PFOS"), Perfluorohexanoic acid ("PFHxA"), Perfluoroheptanoic acid ("PFHpA"), Perfluorohexanesulfonic acid ("PFHxS"), Perfluorobutanesulfonic acid ("PFBS"), Perfluorononanoic acid ("PFNA"), as well as any and all hazardous chemicals produced by Defendants (collectively referred to herein as "PFAS"), — found in the Bella Vista public water supply system owned and operated by Liberty Utilities (Bella Vista Water) Corp. and in the groundwater that serves as supply sources for that system.  As the manufacturers and sellers of products that contain PFAS compounds, Defendants have discharged PFAS into, or are otherwise responsible for PFAS released into, the waters that serve as the supply sources for Plaintiff's public water supply systems.

2.      For years, Defendants manufactured, sold, and distributed PFAS compounds and products containing PFAS chemicals.  These products include the firefighting suppressant agent, Aqueous Film Forming Foam ("AFFF") that contains those compounds, for use at airports, military facilities, and other locations throughout the State of Arizona.

3.    Defendants knew, or should have known, that PFAS and related constituents present unreasonable risks to human health, water quality, and the environment and of the dangers associated with these compounds.  Yet, Defendants handled, discharged and were otherwise responsible for the release of PFAS into the environment without sufficient containment or caution.  Defendants' acts and omissions resulted in the presence of these compounds in the water sources of Plaintiff's groundwater well systems.  As a result of the occurrence of PFAS in the environment from Defendants' discharges, Plaintiff will continue to incur significant costs for ongoing sampling, monitoring, and capital improvements that may be deemed necessary to reduce and/or remove PFAS contamination to assure sufficient non-PFAS impacted water supplies.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction under federal diversity, pursuant to 28 U.S.C. § 1332, as the parties are completely diverse and the amount-in-controversy exceeds $75,000.

5.    Plaintiff brings this civil action directly in *In Re: Aqueous Film-Forming Foams Products Liability Litigation*, Multi-District Litigation ("MDL") No. 2873.  Plaintiff files directly in this venue, the United States District Court for the District of South Carolina, Charleston Division, as allowed under the provisions of Paragraphs 25-29 of this Court's Case Management Order No. 3, dated April 26, 2019 (Doc. # 72).  Plaintiff designates the United States District Court for the District of Arizona as its "Home Venue" under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this Complaint occurred in that District.  But for this Court's Order permitting direct filing in this MDL, Plaintiff would have filed in its Home Venue.

## PLAINTIFF

6.      Plaintiff is an Arizona Corporation, with its principal place of business at 14920 W. Camelback Road, Litchfield Park, AZ 85340.  Plaintiff, which provides service to an estimated 11,151 water connections, is an indirect subsidiary of Algonquin Power & Utilities Corp., which serves approximately 261,000 water connections in the United States.

7.      Plaintiff relies on groundwater aquifers to supply water for its public water systems.

## DEFENDANTS

8.      Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation, with its principal place of business located at 3M Center, St. Paul, Minnesota 55133.

9.      Through at least 2002, 3M manufactured PFOS for use in AFFF and other products, and it manufactured AFFF that contained PFAS compounds.

10.      Defendant Dyneon LLC ("Dyneon") is a subsidiary of 3M and is a Delaware corporation with principal offices at 100 S 5th Street #1075, Minneapolis, MN 55402.

11.      Defendant E.I. DuPont de Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware.  DuPont manufactured, marketed, promoted, distributed, and/or sold products containing PFOA and/or PFOS or which degraded into PFOA and/or PFOS, that were used, inter alia, in AFFF.  Specifically, DuPont was a founding member of the Fire Fighting Foam Coalition and through its active participation in this Coalition, DuPont marketed and sold its fluorosurfactants containing PFAS to AFFF manufacturers.

12.      Defendants The Chemours Company and The Chemours Company FC, LLC, are Delaware corporations with their principal places of business in Wilmington, Delaware.  These

5

Defendants are collectively referred to as "Chemours" or "the Chemours Defendants." In 2015, DuPont spun off its "performance chemicals" business, including its fluoroproduct divisions and business, to Chemours. The fluoroproducts and chemical solutions businesses appear to have been transferred to both The Chemours Company and The Chemours Company FC, LLC. The Chemours Company was incorporated as a subsidiary of DuPont until approximately April of 2015, and The Chemours Company FC, LLC, was formed as a subsidiary around the same time. In approximately July of 2015, Chemours assumed the operations, assets, and certain limited liabilities of DuPont's performance chemical business and began operating as an independent company. As part of this spin-off, Chemours assumed certain environmental liabilities associated with DuPont's historical business lines, including those related to PFOA and PFOS. DuPont and Chemours, as alleged in detail below fraudulently conveyed the assets and liabilities of DuPont in this spin-off.

13.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business in Wilmington, Delaware. Corteva was formed through a series of transactions initiated by the merger of DuPont and the Dow Chemical Company ("Dow") in August of 2017, which formed DowDuPont, Inc. ("DowDuPont"). DuPont and Dow each became subsidiaries of DowDuPont. Corteva was formed as a subsidiary of DowDuPont in 2018, and in approximately June 2019, DowDuPont spun off its agricultural business to Corteva. Corteva is the parent of DuPont, holds all of DuPont's outstanding stock, and holds some of DowDuPont's assets and liabilities, including its agricultural and nutritional businesses, which in turn likely include business lines and liabilities relating to PFAS manufacture, marketing, distribution, and/or sale.

14.     Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont) ("New DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware. DowDuPont

became New DuPont following the Corteva spin-off. New DuPont holds assets in the specialty products businesses, and the remainder of the financial assets and liabilities that DuPont held after the aforementioned spin-offs. Presumably, these assets and liabilities are valued at billions of dollars and are related to DuPont's historic PFAS manufacture, marketing, distribution, and/or sale.

15.     Defendants DuPont, New DuPont, the Chemours Defendants, and Corteva are collectively referred to herein as the "DuPont Defendants."

16.     Defendant Kidde PLC Inc. ("Kidde") is a Delaware corporation authorized to do business in New York, with principal offices at One Carrier Place, Farmington, CT 06034. Upon information and belief, Kidde was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

17.     Defendant Kidde Fire Fighting, Inc. ("Kidde Fire Fighting") is a Pennsylvania corporation with principal offices at 400 Main Street, Ashland, MA 01721. Upon information and belief, Kidde Fire Fighting, was formerly known as National Foam, Inc., National Foam System, Inc., and/or Chubb National Foam, Inc.

18.     Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation, with principal offices at 13995 Pasteur Boulevard, Palm Beach Gardens, FL 33418. Upon information and belief, Carrier was formed in March 2020 when United Technologies Corporation spun off its fire and security business. Upon information and belief, Carrier is the parent corporation of Kidde.

19.     Defendant Angus Fire Armour Corporation ("Angus Fire") is a Delaware corporation, with principal offices at 141 Junny Road, Angier, NC 27501.

20.     Defendant The Ansul Company ("Ansul") is a Wisconsin corporation, with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

21.    At all times relevant, Ansul manufactured fire suppression products, including AFFF that contained PFAS compounds.

22.    Defendant Tyco Fire Products L.P. ("Tyco") is a Delaware limited partnership with principal offices at 1400 Pennbrook Parkway, Lansdale, PA 19446.  Upon information and belief, Tyco is the successor-in-interest to Ansul, Inc. ("Ansul").

23.    Chemguard, Inc. is a Wisconsin corporation, having a principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

24.    At all times relevant, Chemguard, Inc. manufactured fire suppression products, including AFFF that contained PFAS compounds.

25.    Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ.  Upon information and belief, Chubb is registered in the United Kingdom with a registered number of 134210.  Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc.

26.    Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC") is a Delaware corporation with principal offices at 13995 Pasteur Blvd., Palm Beach Gardens, FL 33418.  Upon information and belief, UTC was a division of United Technologies Corporation.

27.    Defendant Raytheon Technologies Corporation ("Raytheon") is a Delaware corporation, with principal offices at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. Upon information and belief, Raytheon is successor-in-interest to United Technologies Corporation.

28.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a North Carolina corporation, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

29.     At all times relevant, Buckeye manufactured fire suppression products, including AFFF that contained PFAS compounds.

30.     Defendant Ciba, Inc. (f/k/a Ciba Specialty Chemicals Corporation) ("Ciba") is a Delaware corporation, with principal offices at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

31.     Defendant BASF Corporation ("BASF") is a Delaware Corporation, with principal offices at 100 Park Avenue, Florham Park, NJ 07932.  Upon information and belief, BASF is the successor-in-interest to Ciba.  Defendant BASF Corporation ("BASF") is a Delaware Corporation, with principal offices at 100 Park Avenue, Florham Park, NJ 07932.  Upon information and belief, BASF is the successor-in-interest to Ciba.

32.     Defendant Dynax Corp. ("Dynax") is a Delaware corporation, with principal offices at 103 Fairview Park Drive, Elmsford, NY 10523.

33.     Defendant Clariant Corp. ("Clariant") is a New York corporation, with principal offices at 4000 Monroe Road, Charlotte, NC 28205.

34.     Defendant Archroma U.S., Inc. ("Archroma") is a Delaware corporation with its principal offices at 5435 77 Center Dr., #10 Charlotte, NC 28217.

35.     Defendant Arkema Inc. ("Arkema") is a Pennsylvania corporation, with principal offices at 900 1st Avenue, King of Prussia, PA, 19406.

36.     Defendant ChemDesign Products, Inc. ("ChemDesign") is a Delaware corporation, with principal offices at 2 Stanton Street, Marinette, WI 54143.

37.     Defendant AGC Chemicals Americas Inc. ("AGC") is a Delaware corporation, with principal offices at 55 E Uwchlan Ave, Suite 201, Exton, PA 19341.

38.     Defendant Chemicals Inc. a Texas corporation, with principal offices at 12321 Hatcherville Road, Baytown, TX 77521.

39.     Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation, with principal offices at 196122 E County Road 40, Woodward, OK 73801.

40.     Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation, with principal offices at 2300 Banks Street, Fort Mill, SC 29715.

41.     Upon information and belief, Defendants Chemicals, Inc., Deepwater, and Nation Ford designed, manufactured, marketed, distributed, and sold fluorosurfactant products containing PFAS for use in the manufacture of AFFF products throughout the United States.

42.     Defendant Williams Fire & Hazard Control, Inc. ("Williams") is a Texas corporation, with principal offices at 9605 Richard Wycoff Drive, Port Arthur, TX 77640.

43.     Upon information and belief, Defendant Williams distributed and/or sold AFFF products containing PFAS throughout the United States.

44.     Upon information and belief, Defendants John Does 1-50 also manufactured, distributed, and/or sold products that contain PFAS compounds.  Plaintiff presently lacks information sufficient to specifically identify the names of Defendants sued herein under the fictitious names DOES 1 through 50.  Plaintiff will amend this Complaint to show their true names if and when they are ascertained.

## PER- AND POLYFLUOROALKYL SUBSTANCES

45.     PFAS compounds are a family of synthetic chemicals, also known as perfluorochemicals ("PFCs"), which have been used for decades to make products that resist heat,

oil, stains, grease and water.

46.    In the 1940s and 1950s, 3M began creating PFAS chemicals and incorporating them into their products after recognizing their surfactant properties.  Over the years, PFAS chemicals were sold to other companies for use in AFFF and a variety of other products, including stain resistant carpeting and upholstery, clothing, paper packaging for food, water and grease resistant cookware.

47.    AFFF was introduced commercially in the mid-1960s and rapidly became the primary fire-fighting foam in the United States and other parts of the world.  AFFF is a Class-B firefighting foam, which is water-based and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

48.    AFFF is synthetically formed by combining fluorine free hydrocarbon foaming agents with highly fluorinated surfactants.  When mixed with water, the resulting solution has the characteristics needed to produce an aqueous film that spreads across the surface of a hydrocarbon fuel.  It is this film formation feature that provides fire extinguishment and is the source of the designation, aqueous film forming foam.

49.    PFAS are extremely persistent in the environment and resistant to typical environmental degradation processes.  In addition, they are thermally stable synthetic organic contaminants, are likely carcinogenic, and have been shown to correlate with thyroid disease and immune deficiencies.  PFAS also have high water solubility (mobility) and low biodegradation (persistence).

50.    PFAS, in particular PFOA and PFOS, have been identified as "emerging contaminants" by the United States Environmental Protection Agency ("EPA").  This term describes contaminants about which the scientific community, regulatory agencies and the general

public have a new and increasing awareness or understanding about how they move in the environment or affect public health.

51.    PFAS, like other emerging contaminants, have become the focus of active research and study, which means that new information is released periodically regarding the effects on the environment and human health as a result of exposure to the chemicals.

52.    Certain PFAS compounds, such as PFOA (which is also known as "C8" because it contains eight carbon compounds) and PFOS, have been the focus of the Arizona Department of Environmental Quality ("ADEQ") and EPA investigations.

53.    United States EPA studies have indicated that exposure to PFOA and PFOS over certain levels can result in adverse health effects, including but not limited to developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes).

54.    In January 2009, EPA established a drinking water Provisional Health Advisory Level ("HAL") for PFOA and PFOS, the two PFAS compounds about which it had the most toxicological data.  EPA set the Provisional HAL at 0.4 parts per billion (ppb) for PFOA and 0.2 ppb for PFOS.

55.    In connection with its emerging contaminant studies, EPA implemented an Unregulated Contaminant Monitoring Rule Number 3 in 2012 ("UCMR 3"), which was designed to collect nationwide information regarding the occurrence of PFAS contamination in the public's water supply.

56.     UCMR 3 required sampling of Public Water Systems ("PWSs") serving more than 10,000 people (i.e., large systems) and 800 representative PWSs serving 10,000 or fewer people (i.e., small systems) for 21 chemicals, including a number of PFASs, during one consecutive twelve month period in the timeframe between 2013 through 2015.

57.     In 2015 Plaintiff participated in the UCMR 3 sampling for its facilities that serve more than 10,000 people.

58.     The results of the UCMR 3 sampling revealed the presence of PFAS compounds in the active groundwater sources in the Bella Vista system.

59.     Sampling under UCMR 3 used higher reporting limits than would be applicable in light of scientific information and guidance levels developed since that time, which are much lower than those employed in 2008 and 2009.

60.     In addition, the UCMR 3 sampling effort did not combine PFAS levels, thus not taking into account added effects from the presence of more than one PFAS compound.

61.     In May 2016, EPA issued new HALs for PFOA and PFOS, identifying 0.07 ppb (or 70 parts per trillion (ppt)) as the concentration of PFOA or PFOS in drinking water at or below which health effects are not anticipated to occur over a lifetime of exposure. EPA acknowledged then, and continues to acknowledge, that the studies associated with PFAS compounds are ongoing, and as such, the HALs may be adjusted based upon new information.

62.     In EPA's February 2020 PFAS Action Plan: Program Update, the agency included information on a newly approved laboratory method – Drinking Water Method 533 – for testing and detecting PFAS in drinking water.  This new method allows for more effective measurement of PFAS in drinking water.

63.     In October 2021, EPA released its PFAS Strategic Roadmap, outlining the agency's proposed actions related to PFAS contamination, with a focus on researching PFAS exposures, effects, and interventions, preventing further PFAS contamination, and cleaning up existing PFAS contamination.

64.     On December 27, 2021, EPA published the final fifth Unregulated Contaminant Monitoring Rule, which will require sample collection for 29 PFAS between 2023 and 2025.

65.     On June 15, 2022, EPA issued updated HALs for four PFAS compounds, including final HALs for GenX and PFBS at 10 ppt and 2,000 ppt, respectively, and interim HALs for PFOA and PFOS at 0.004 ppt and 0.02 ppt, respectively.

66.     On August 26, 2022, EPA issued a proposal to designate PFOA and PFOS, including their salts and structural isomers, as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCA").  The public comment period for the proposal closed on November 7, 2022, and EPA is in the process of reviewing comments.

67.     The Arizona Department of Environmental Quality ("ADEQ") and the Arizona Corporation Commission ("ACC") are also working to determine the extent of PFAS contamination within the state and participating in related discussions with federal, state and local partner agencies.  ADEQ also announced in 2022 a plan to ensure every public water system in Arizona is tested for PFAS.

68.     Additionally, bills have been introduced in the Arizona Legislature to address PFAS contamination within the state.

69.     During the 2019 Legislative Session, the Arizona Legislature passed SB1526, limiting the use of firefighting foam containing PFAS.  This legislation went into effect on January

1, 2020, and prohibits use of class B firefighting foam that contains intentionally added PFAS chemicals unless (1) the discharge or other use occurs in fire prevention or in response to an emergency firefighting operation or (2) the discharge or other use is for training purposes if required by law or federal regulation or at a testing facility that has implemented containment, storage, treatment, and disposal measures to prevent uncontrolled releases of such class B firefighting foam into the environment.

70.     While more studies have been conducted, and thus, more is known regarding PFOA and PFOS, all PFAS compounds have generally demonstrated similar characteristics to PFOA and PFOS.

71.     Although some PFAS compounds have been shown to break down, the resulting products typically end at non-biodegradable PFOA and PFOS.

72.     As manufacturers, sellers, handlers and dischargers of PFAS compounds, and products containing PFAS, Defendants knew or should have known that the inclusion of PFAS chemicals in any products presented an unreasonable risk to human health and the environment.

73.     Defendants knew or should have known that PFAS compounds are highly soluble in water, highly mobile, extremely persistent, and highly likely to contaminate water supplies if released to the environment.

74.     Defendants' prior knowledge of the adverse impacts from PFAS compounds to human health and the environment amounts to reckless disregard to human health and environmental safety.   Nonetheless, Defendants negligently and recklessly manufactured, distributed, and/or sold PFAS and products containing PFAS with no warnings or instructions on use or disposal to avoid contamination.

15

75.    Defendants' actions have directly resulted in contamination of certain groundwater wells that make up Plaintiff's water supply system.  Because Defendants' PFAS has infiltrated the waters that serve as the source for Plaintiff's public water supply system, contamination of Plaintiff's wells is recurring and continuing.

**ILLEGAL TRANSFERS BETWEEN THE DUPONT DEFENDANTS**

76.    In approximately 2014, DuPont formed Chemours as a wholly-owned subsidiary. At that time, Chemours apparently had a board of directors, but that board was controlled by DuPont.

77.    In July of 2015, DuPont transferred its "performance chemicals" business to The Chemours Company.  Around the same time, The Chemours Company FC, LLC was formed as a subsidiary of The Chemours Company.  The transfer of the "performance chemicals" business included at least titanium technologies, fluoroproducts, and chemical solutions. The fluoroproducts and chemical solutions transfers appear to have been made to The Chemours Company and the Chemours Company FC, LLC (again, collectively "Chemours").

78.    In addition to the transfer of these business lines, Chemours assumed various liabilities for DuPont's prior use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities that Chemours took on are not publicly available.[1]

79.    The DuPont-Chemours transfer included incredible amounts of debt and multiple failing product lines.  Significantly, DuPont pinned on Chemours its historic (and future) environmental liabilities, which were known by DuPont to be massive.  Chemours did not receive

---

[1] For instance, various of The Chemours Company's and Dupont's public filings indicate that both The Chemours Company and the Chemours Company FC, LLC were transferred assets that include fluoroproducts and chemical solutions business lines.

16

a reasonably equivalent value in exchange for this transfer or obligation.  Likewise, the assets transferred to Chemours were unreasonably small in relation to the business or transaction.  DuPont knew or reasonably should have known that Chemours would incur debts beyond its ability to pay them when they became due.

80.    At the time of the DuPont-Chemours transfer, the DuPont performance chemicals business held an estimated debt of approximately $4 billion.

81.    At that same time, DuPont announced that it planned to phase out production and use of PFOA, a major component of its fluoroproducts line, by 2015.

82.    Per the Separation Agreement governing the DuPont-Chemours transfer, Chemours agreed to indemnify DuPont against, and assumed for itself, all of DuPont's liabilities from DuPont's performance chemicals business, with no time limitation.  This indemnification remains uncapped.  Chemours also agreed to indemnify DuPont against and assume for itself the performance chemical liabilities without regard to the nature of the liabilities, when they were incurred or arose, or which entity is named as the responsible party.  Chemours further agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the performance chemicals business, which would be based on a determination made by DuPont that the liability was 50.1% attributable to DuPont's performance chemicals operations.

83.    Chemours also agreed to substitute itself for DuPont with regard to any order, decree, judgment, agreement or action relating to the environmental liabilities it assumed.

84.    At the time of the DuPont-Chemours spin-off in 2015, DuPont was fully aware of its potential liabilities related to PFAS contamination throughout the United States.

85.     Until the completion of the spinoff, Chemours was a wholly-owned subsidiary of DuPont, and even though Chemours had a separate board, the board was controlled by DuPont. After the spin-off, new members of the Chemours board were appointed.  The spin-off and related decisions were conducted while DuPont controlled the board.  The new Chemours board did not take part in the separation.

86.     DuPont's knowledge and assessment of its liabilities—including environmental and other performance chemicals liabilities—have been comprehensive since it began its performance chemical operations, and its litigation-related liabilities have been increasing since at least the early 2000's.  For example, in 2005, DuPont agreed to pay $16.5 million to resolve claims brought by the EPA for violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act related to its PFAS compounds.  Although seemingly small, this was the largest such PFC-related penalty in history at the time it was levied.

87.     Relatedly and also in 2005, DuPont incurred hundreds of millions of dollars of liability related to litigation against it for the health risks of its PFOA use and disposal in Ohio and West Virginia, which had caused thousands of people to receive serious medical diagnoses, including cancer, attributable to DuPont's PFCs.

88.     In 2016, Chemours itself acknowledged in an SEC filing that the anticipated outcomes in the Ohio litigation could materially and adversely affect Chemours' financial positions in terms of its operations and liquidity.

89.     Subsequently, DuPont and Chemours agreed to pay $671 million to resolve the Ohio claims.  Chemours and DuPont each additionally agreed to pay $25 million annually for future PFOA-related costs not covered by the settlement for the following five years.

90.     At the time of the DuPont-Chemours spin-off, DuPont had been sued, had been on notice of impending suits, and/or actually knew of likely litigation and its liability for damages and injuries from the manufacture of PFAS and products that contain PFAS. Chemours' assumptions of liability were not limited to PFAS-related conduct; it also assumed various environmental liabilities related to prior, pending, and future litigation regarding other performance chemicals, such as benzene.

91.     The intent and effect of creating Chemours was to allocate an enormous portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products. DuPont and Chemours effectuated this spin-off with the knowledge that Chemours would be insolvent and would not be able to bear the liabilities that DuPont transferred to Chemours. DuPont and/or Chemours engaged in this process with the actual intent to deceive. This fraudulent conveyance has likely limited the availability of funds to cover DuPont's liability, including for the claims that arise out of this case, which has and will further harm Plaintiff.

## PLAINTIFF'S WATER SYSTEM IMPROVEMENTS

92.     Plaintiff is committed to the supply of potable drinking water consistent with federal and state guidelines and requirements. Plaintiff must therefore implement remedies to assure that the water it supplies to its customers meets these standards.

93.     As a direct result of Defendants' actions, Plaintiff has had to address PFAS contamination. In doing so, Plaintiff has conducted and continues to conduct sampling, studies and investigations related to PFAS, which requires funding by Plaintiff, including costs for its personnel to supervise the assessments, and costs to develop PFAS treatment scenarios, and costs to analyze available alternatives.

94.     Plaintiff will continue to incur significant costs, for ongoing monitoring and any capital improvements that may be deemed necessary to reduce and/or remove PFAS contamination to assure sufficient non-PFAS impacted water supplies.  Operation and maintenance measures for any such improvements will be required and will add further to the costs Plaintiff has incurred and will incur to address Defendants' PFAS contamination.

## CAUSES OF ACTION

## COUNT ONE – STRICT LIABILITY (ABNORMALLY DANGEROUS ACTIVITY) AGAINST ALL DEFENDANTS

95.     Plaintiff hereby incorporates by reference the allegations set forth in each and every preceding paragraph of this Complaint as if they were set forth fully herein.

96.     Defendants engaged in the design, manufacturing, marketing, and sales of PFAS chemicals and products containing PFAS, which Defendants knew or should have known, would result in contamination of the environment, including the waters that serve as the water source for Plaintiff's public water supply system, thereby causing damage to Plaintiff.

97.     Defendants knew or should have known of the adverse impacts the exposure to its PFAS compounds would have on the environment and the activities and rights of others.

98.     Defendants knew or should have known of the persistence and high mobility of PFAS in the environment, and the foreseeable risk that their PFAS and PFAS-containing products would be discharged, released, or disposed of in the environment.

99.     Defendants knew or should have known that the discharge of hazardous substances and chemicals would result in a high degree of risk and serious harm to human health and to the environment, irrespective of the level of care exercised.

100.     Defendants' abnormally dangerous manufacture, use, and sale of PFAS chemicals is not a matter of common usage.

20

101.    Any value provided to the community by Defendants' conduct is substantially outweighed by the dangerous attributes inherent to the design, manufacture, handling, storing, transporting, use, and sale of PFAS chemicals and the resulting contamination of Plaintiff's public water supply systems.

102.    By causing PFAS contamination and the resulting impact to Plaintiff's public water supply systems, Defendants engaged in abnormally dangerous activity for which they are strictly liable.

103.    As a result of Defendants' abnormally dangerous activity, Plaintiff has incurred, and will continue to incur, investigation, cleanup, remediation, and removal costs and damages related to PFAS contamination.

## COUNT TWO – STRICT LIABILITY (FAILURE TO WARN) AGAINST ALL DEFENDANTS

104.    Plaintiff hereby incorporates by reference the allegations set forth in each and every preceding paragraph of this Complaint as if they were set forth fully herein.

105.    Defendants engaged in the design, manufacturing, marketing, and sales of PFAS chemicals and products containing PFAS, which Defendants knew or should have known, would result in contamination of the environment, including the waters that serve as the water source for Plaintiff's public water supply systems, thereby causing damage to Plaintiff.

106.    Defendants knew or should have known of the adverse impacts the exposure to its PFAS compounds would have on the environment and the activities and rights of others.

107.    Defendants knew or should have known of the persistence and high mobility of PFAS in the environment, and the foreseeable risk that their PFAS and PFAS-containing products would be discharged, released, or disposed of in the environment.

21

108.    Defendants failed to provide warnings or instructions sufficient to notify the users of the dangers inherent in their products.

109.    Defendants' failure to provide notice or instruction regarding the dangers to human health and the environment rendered Defendants' PFAS and PFAS-containing products unreasonably dangerous for the purposes intended and promoted by Defendants.

110.    This failure to warn or adequately instruct regarding the dangers associated with use of these products directly and proximately caused harm to Plaintiff.

<u>**COUNT THREE – STRICT LIABILITY (DESIGN DEFECT)**</u>
<u>**AGAINST ALL DEFENDANTS**</u>

111.    Plaintiff hereby incorporates by reference the allegations set forth in each and every preceding paragraph of this Complaint as if they were set forth fully herein.

112.    Defendants herein, at all times relevant, were in the business of the design, manufacture, sale and distribution of PFAS and PFAS-containing products.

113.    Defendants designed, manufactured, marketed, and sold defective products that were unreasonably dangerous for their intended use.

114.    When Defendants placed PFAS and their PFAS-containing products into the stream of commerce, the products were defective, unreasonably dangerous, and not fit, suitable or safe for the intended, foreseeable and ordinary uses.

115.    The products designed, manufactured, sold and distributed by Defendants reached consumers and users without substantial change to the condition and nature of the products.

116.    Defendants, with knowledge of the risks associated with the use of PFAS compounds, failed to use reasonable care in the design of PFASs.

117.    The defects in Defendants' products existed at the time the product left Defendants' control and were known to Defendants.

118.    Reasonable safer alternatives exist and were available to Defendants at all relevant times.  Thus, the risks of Defendants' products outweighed the benefits.

119.    The defects in Defendants' products proximately caused and have directly resulted in the damages of which Plaintiff complains.

## COUNT FOUR – NEGLIGENCE
## AGAINST ALL DEFENDANTS

120.    Plaintiff hereby incorporates by reference the allegations set forth in each and every preceding paragraph of this Complaint as if they were set forth fully herein.

121.    Defendants had a duty to exercise due or reasonable care in the manufacture, distribution, and use of its PFAS chemicals and PFAS-containing products so as to avoid harm to those who would be foreseeably injured by PFAS environmental contamination.

122.    Defendants knew or should have known that their PFAS products would result in the release, discharge, or disposal of PFAS compounds into the environment that would lead to contamination of drinking water supplies and hazards to human health if not treated.

123.    Defendants' failure to exercise due care in their manufacture, distribution, and use of PFAS chemicals and PFAS-containing products created an unreasonably dangerous product.

124.    Any benefits associated with the use of Defendants' PFAS chemicals and PFAS-containing products are substantially outweighed by the serious and dangerous risks that accompany said use.

125.    By failing to exercise due care in the design, manufacturing, marketing, and sale of PFAS and their PFAS-containing products, Defendants breached their duty to avoid harm to Plaintiff.

126.    As a result of Defendants' negligence, Plaintiff has incurred, and will continue to incur, investigation, cleanup, remediation, and removal costs and damages related to PFAS contamination.

127.    Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiff.

128.    As a direct and proximate result of Defendants' actions and omissions, Plaintiff has suffered and continues to suffer damages.

## COUNT FIVE – PRIVATE NUISANCE
## AGAINST ALL DEFENDANTS

129.    Plaintiff hereby incorporates by reference the allegations set forth in each and every preceding paragraph of this Complaint as if they were set forth fully herein.

130.    Through Defendants' acts and omissions, Defendants' PFAS and PFAS-containing products have directly and proximately caused environmental contamination that has physically invaded Plaintiff's property and unreasonably interfered with, and continues to interfere with, Plaintiff's use and enjoyment of its public water supply systems and the water sources that supply those systems.

131.    The private nuisance created by Defendants is substantial and continuing.

132.    Defendants have failed, and continue to fail, to abate the private nuisance.

133.    As a result of the private nuisance, Plaintiff has suffered and continues to suffer, significant harm and damages, including investigation, cleanup, remediation, and removal costs and damages related to the detection, treatment and removal of PFAS constituents that have and will continue to migrate into Plaintiff's groundwater wells.

24

## COUNT SIX – PUBLIC NUISANCE
## AGAINST ALL DEFENDANTS

134.    Plaintiff hereby incorporates by reference the allegations set forth in each and every preceding paragraph of this Complaint as if they were set forth fully herein.

135.    Through Defendants' acts and omissions, Defendants' PFAS and PFAS-containing products have directly and proximately caused environmental contamination that has unreasonably interfered with, and continues to interfere with, Plaintiff's right to a clean environment, which right Plaintiff holds in common with members of the public, and which right is specifically permitted.

136.    Through Defendants' acts and omissions, Defendants' PFAS and PFAS-containing products have directly and proximately caused environmental contamination that has unreasonably interfered with, and continues to interfere with, Plaintiff's right to the use of waters that serve as a source of potable water, which right Plaintiff holds in common with members of the public, and which right is specifically permitted.

137.    The public nuisance created by Defendants is substantial and continuing.

138.    Defendants have failed, and continue to fail, to abate the public nuisance.

139.    As a result of the public nuisance, Plaintiff has suffered and continues to suffer, significant harm and damages special to Plaintiff and different in kind from those the general public may have suffered, including investigation, cleanup, remediation, and removal costs and damages related to the detection, treatment and removal of PFAS constituents that have and will continue to migrate into Plaintiff's groundwater wells, such that Defendants should be required by injunction to abate the nuisances they have created.

## COUNT SEVEN – FRAUDULENT CONVEYANCE
## VIOLATION OF ARIZONA UNIFORM FRAUDULENT TRANSFER ACT
## ("AZUFTA") AGAINST THE DUPONT DEFENDANTS

140.    Plaintiff hereby incorporates by reference the allegations set forth in each and every preceding paragraph of this Complaint as if they were set forth fully herein.

141.    Plaintiff seeks all relief available under the AZUFTA for the Dupont Defendants' violations of the AZUFTA for their fraudulent conveyances as part of their various spin-off transactions.[2]

142.    Pursuant to the AZUFTA:

> (A) transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation under any of the following:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor;
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:
>
>> (a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; [or]
>>
>> (b) Intended to incur or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as the debts became due.

ARIZ. REV. STAT. ANN. §§ 44-1004.  Additionally, under the AZUFTA:

---

[2] As previously defined, the "DuPont Defendants" refers to all DuPont entities named herein, including Defendant Corteva, and all Chemours entities named herein.

26

> A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

ARIZ. REV. STAT. ANN. §§ 44-1005.

143.    The DuPont Defendants engaged in acts in furtherance of a scheme to transfer DuPont's assets so that parties in PFAS litigation, such as Plaintiff, could not obtain funds or collect a judgment which they are or will be owed.  As a result of the DuPont Defendants' acts, omissions, and other conduct described herein, Plaintiff has been damaged.

144.    At all relevant times, the DuPont Defendants have (1) acted with actual intent to hinder, delay, and defraud parties; (2) acted without receiving a reasonably equivalent value in exchange for the transfer obligation arising out of the DuPont-Chemours spin-off; and/or (3) were engaged or were about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business or that the business intended to incur, or those liabilities the DuPont Defendants believed or reasonably should have believed that Chemours would incur.

145.    For decades, DuPont manufactured, marketed, distributed, and/or sold PFAS for use in AFFF and/or AFFF containing PFAS with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would impact groundwater, Plaintiff's water supplies, and other natural resources.

146.    As a result of the transfer of assets and liabilities described herein, the DuPont Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from their manufacture, marketing, distribution, and/or sale of

AFFF containing PFAS and/or PFAS for use in AFFF.

147.    At the time of the transfer of its performance chemical business to Chemours, DuPont had been sued, had notice of suits, and/or had knowledge of likely litigation regarding DuPont's liability from the manufacture, marketing, distribution, and/or sale of AFFF containing PFAS and/or PFAS compounds for use in AFFF.

148.    The DuPont Defendants acted without receiving consideration and/or a reasonably equivalent value in exchange for the transfer or obligation, and DuPont believed or reasonably should have believed that Chemours would incur debts beyond Chemours' ability to pay when those debts became due.

149.    The claims, judgment, and potential judgments against Chemours potentially exceed its ability to pay.  Accordingly, Plaintiff seeks avoidance of the transfer of DuPont's liabilities for the claims brought herein and seeks to hold the DuPont Defendants liable for any damages or other remedies that may be awarded by the Court or jury arising from this Complaint. Plaintiff further seeks all other rights and remedies that may be available to it under CUVTA, including prejudgment remedies as available under applicable law, as may be necessary for full compensation of damages and injuries Plaintiff has suffered as alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Liberty Utilities (Bella Vista Water) Corp. ("Liberty") respectfully requests that this Court:

   a.  Enter judgment finding Defendants jointly and severally liable for all costs and damages incurred by Plaintiff, including but not limited to prior, interim and future capital as well as operation and maintenance costs related to PFAS contamination;

including the reasonable costs of sampling, investigations, and assessment of injury, and destruction or loss resulting from PFAS contamination;

b.  Enter judgment finding Defendants jointly and severally liable for cleanup and removal costs and damages, including but not limited to prior, interim and future capital as well as operation and maintenance costs, including the reasonable costs of assessing injury, destruction or loss resulting from the discharges, and threatened discharges;

c.  Enter judgment finding Defendants liable for punitive damages;

d.  Enter judgment finding Defendants liable for consequential damages;

e.  Enter judgment requiring, via injunction, Defendants to abate the nuisance they have created;

f.  Award Plaintiff costs and reasonable attorney fees incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

g.  Award Plaintiff such other relief as this Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Demand is hereby made for a trial by jury.

Attorneys for the Plaintiff

By:
_/s/ Christiaan A. Marcum_____
Christiaan A. Marcum (Federal I.D. No. 7556)
ROGERS, PATRICK,
WESTBROOK, & BRICKMAN LLC
1037 Chuck Dawley Blvd., Bldg. A
Mount Pleasant, SC 29464
(843) 727-6642
cmarcum@rpwb.com

Fred Thompson III
T. David Hoyle
Rebecca A. Fonseca
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
fthompson@motleyrice.com
dhoyle@motleyrice.com
rfonseca@motleyrice.com

T. Roe Frazer II
FRAZER PLC
30 Burton Hills Boulevard, Suite 450
Nashville, Tennessee 37215
(615) 647-0990
roe@frazer.law

Gregory A. Cade
ENVIRONMENTAL LITIGATION
GROUP, P.C.
2160 Highland Ave. S.
Birmingham, AL 35205
(205) 328-9200
gregc@elglaw.com

Frederick T. Kuykendall, III
THE KUYKENDALL GROUP
P.O. Box 2129
Fairhope, AL 36533
(205) 252-6127
ftk@thekuykendallgroup.com

Dated: June 12, 2023